OPINION OF THE COURT
Allan L. Winick, J.
Petitioner, pursuant to section 16-102 (3) of the Election Law, asks this court to direct the Board of Elections of Nassau County to conduct a new primary election for the Republican candidate for the Office of Member of Congress for the Fourth Congressional District in that County.
Respondent Frisa cross-moves in this special proceeding for an order permitting him to file a petition pursuant to Election Law § 16-106 (2) and § 9-208 (1), which contains a cross claim to direct that he be certified as the winner of the primary election for the Republican Party, Fourth Congressional District.
A primary election for that office was held on September 13, 1994 along with such an election for the Republican nomination for the Office of Governor, several Democratic contests and a Conservative Party primary.
After the election night count for Congress, the vote stood at a difference of 276 votes in favor of Frisa out of a total vote cast of over 24,000.
A count of absentee and affidavit ballots plus a recanvass of the machine count lowered the difference to 54 votes in Frisa’s favor.
It is uncontested that advice of this latter count was not communicated to the candidates or their representatives until September 23, 1994, after 5:00 p.m., 10 days after the primary.
A petition was filed in the County Clerk’s office on September 28th, when an order to show cause, staying certification of the election by the Board of Elections, was signed by a Justice of this court. The hearing on the petition was scheduled for October 3, 1994.
At the hearing before the undersigned the only issue raised by the petitioner was directed at an alleged irregularity between the count of the votes cast at the election on the machines and the number of Republican voters who signed *863 the buff cards for registrants who voted in person in the primary. In election districts where there was such an alleged discrepancy, the total of votes cast for Republican candidates in the Fourth Congressional District exceeded the number of signers of the buff cards for Republicans, in a claimed approximately 200 election districts. Such a conclusion was arrived at by taking the number of votes cast for the Office of Governor, on the Republican line, which had a higher number of votes cast than was cast for Congress, and comparing the number of Republican voters signing the buff cards.
The machine counter only recorded the total number of voters voting on the machine, including Democrats and Conservatives, who voted at the election. The conclusion reached by petitioner was based on his count of the votes cast for Congress as recorded after the election against the number of voters signing the book.
The result of doing this, as claimed by petitioner (affidavit of Robert Barra, which actually listed 123 districts), showed more votes were cast on the machine than were accounted for in the buff cards and this discrepancy should be used by this court to decide if the percentage of error was so high, based on an ultimate 54-vote differential, to conclude that there was no way for this court to decide who won the primary election, thus entitling petitioner to a new election.
Respondent, Frisa, raises only an issue of jurisdiction, which if correct, would make any such determination unnecessary.
This threshold issue is whether petitioner is time barred from raising his arguments, thus leaving this court without jurisdiction to entertain his application for a new primary election.
Election Law § 16-102 (2) has always provided that a proceeding commenced with respect to a primary must be instituted within 10 days after the holding of such primary. As far back as 1978, the language of section 16-102 (2) has stated that: "A proceeding with respect to a petition shall be instituted within fourteen days after the last day to file the petitions; or if such proceeding is in connection with a petition for a village election or an independent nomination for a special election, it shall be instituted within seven days after the last day to file the petition for such village election or independent nomination; or if in connection with a primary, *864 convention, or caucus, within ten days after the holding of such primary, convention or caucus.” (Emphasis added.)
The language of subdivision (2) was subsequently amended on three separate occasions. In 1981, the Legislature substituted (Historical and Statutory Notes, McKinney’s Cons Laws of NY, Book 17, Election Law § 16-102, 1994 Pocket Part, at 88): "1981 Amendment. Subd. 2. L.1981, c. 305, §1, eff. Dec. 1, 1981, substituted 'or convention or the filing of the certificate of nominations made at such caucus’ for ', convention or caucus’.”
In 1986 the Legislature again amended the statute (ibid.): "1986 Amendments. Subd. 2. L.1986, c. 710, §1, eff. July 30, 1986, inserted 'meeting of a party committee’ in two instances.”
Finally, in 1992, major changes were made by the Legislature which inserted the following language (ibid.): "1992 Amendments. Subd. 2. L.1992, c. 79, §27, eff. May 8, 1992, inserted language allowing proceedings to be commenced within 3 business days after officer or board makes determination of invalidity, provided such date is later than a stated number of days after the last day to file such petition, in two instances; and required proceedings concerning primaries, conventions party committee meetings or caucuses to be instituted within ten days after such event.”
Election Law § 16-102 (2) presently reads as follows: "A proceeding with respect to a petition shall be instituted within fourteen days after the last day to file the petition, or within three business days after the officer or board with whom or which such petition was filed, makes a determination of invalidity with respect to such petition, whichever is later; except that a proceeding with respect to a petition for a village election or an independent nomination for a special election shall be instituted within seven days after the last day to file the petition for such village election or independent nomination or within three business days after the officer or board with whom or which such petition was filed, makes a determination of invalidity with respect to such petition, whichever is later. A proceeding with respect to a primary, convention, meeting of a party committee, or caucus shall be instituted within ten days after the holding of such primary or convention or the filing of the certificate of nominations made *865 at such caucus or meeting of a party committee.” (Emphasis added.)
In 1992, the Legislature ameliorated the time limits for instituting an action with respect to a petition. It permitted a proceeding to be instituted within 14 days after the last day to file a petition, or within 3 business days after the officers or board with whom or which such petition was filed made a determination of invalidating with respect to the petition, whichever is later. It did the same with respect to a village election or independent nomination.
The 1992 amendments were codified by the Legislature as a result of numerous problems that had arisen in the "petition process”. The Court of Appeals in the landmark decision of Matter of Pell v Coveney (37 NY2d 494) outlined the problem.
In Pell (supra), the petitioners sought an order compelling the Board of Elections of Suffolk County to validate certain designating petitions. Respondent moved to dismiss the petition claiming that the proceeding was time barred since the application was not commenced within 14 days after the last day to file petitions. In 1975, the last day for filing designating petitions was July 24, 1975. The proceeding was instituted August 21, 1975, the date petitioners learned that the designating petitions were declared invalid by the Board of Elections.
The Court of Appeals found that "[t]o hold that the petitioners are foreclosed from seeking their statutory remedy under these circumstances would be to frustrate the legislative purpose and lead to a perverse result” (Matter of Pell v Coveney, supra, at 496). In its decision the Court wrote: "It is fundamental that a statute must be read with the legislative goal in mind, so that controversies generated by ambiguities or gaps in the law may be resolved in accordance with the legislative scheme. (See 1 Kent Commentaries 462.) Courts are obligated to apply a statute to the extent possible to accomplish its purpose and to avoid incongruous, unreasonable, or unjust results. If we were to apply the statute in this case simplistically, based on a mechanical reading of language, the legislative purpose of providing a judicial remedy would be denied in precisely the kind of case where it might be most needed, namely where the board has been guilty of undue delay unnecessarily, or worse, deliberately (cf. Davidson v Eastman, 35 NY2d 735).” (Supra, at 496.)
*866 That case, the Court was careful to point out, was limited to its facts. Exhaustive research was conducted by this court to determine whether the courts have entertained similar applications with respect to a primary result.
The case of Matter of Voyticki v Gore (134 AD2d 354) appears to be on point. In Voyticki the petitioner commenced a proceeding to invalidate the Republican primary election held September 15, 1987. Respondent was not served until September 30, 1987, 15 days after the primary. The Second Department affirmed the lower court sustaining its dismissal of the petition due to petitioner’s failure to institute this action timely (i.e., within the 10-day statutory period).
The courts have found that a failure to commence the proceeding in a timely manner is a jurisdictional defect which precludes judicial review. (Mackey v Nassau County Democratic Comm., 147 AD2d 688, 689.) It is irrelevant whether the proceeding is to contest a primary result, convention, meeting of a party committee or caucus (Matter of Voyticki v Gore, supra; Matter of Leirer v Suffolk County Comm., 166 AD2d 449). There is no exception carved out by the courts for those types of proceedings.
Petitioner contends that this court should follow the standard laid out in Pell (supra). In support of his argument, petitioner points to the codification of Pell (L 1992, ch 79, § 27, eff May 8, 1992). This argument is without merit. The Legislature, in 1992, saw fit not to change the statute with respect to a primary result, although it had ample opportunity to do so. Petitioner argues that the amendment to the section was "aimed at the designated petition process — not the Primary process”. It is apparent that the Legislature was aware of the problem and could have amended the statute with respect to a primary result on three separate occasions (1981, 1986 and 1992), when it amended Election Law § 16-102 (2). An examination of the Session Laws of the State of New York (L 1992, ch 79, §27) reveals that additional language was added in 1992, specifically segregating, inter alla, a primary from the part of the statute which was substantially amended. The Legislature did, however, add specific language re-affirming that the statute was to remain the same with respect to a primary. The language "shall be instituted” was added directly before the language "within [a] 10 day [period]” in 1992. *867 No alternative was added. The changes lead the court to believe that the Legislature was aware of the problem, but decided not to amend the statute with respect to a primary.
Petitioner also alleges that he did not know, nor could he have known, the results of the election within the 10-day Statute of Limitations permitted in Election Law § 16-102 (2). Petitioner and his adversary knew, however, the night of the primary, the closeness of the election results, to wit, 276 votes. Certainly, with the closeness of the vote, petitioner could have instituted a proceeding to protect his rights on any . day from September 13th to September 23rd. The courts have found that an objector to a petition must commence an invalidation proceeding within the statutory time period, irrespective of any determination by the Board of Elections. (Matter of Thompson v Wallace, 45 NY2d 803.) There was no reason petitioner, in this case, should have let the 10-day period lapse even though the Board of Elections had not rendered its decision. If the Legislature wanted a candidate to await the end of a recanvass period, it would have amended the statute to reflect that as it did with respect to petitions, village elections and independent nominations. Moreover, petitioner did nothing on Monday, September 26th, or Tuesday, September 27th, to start a proceeding, even though, by that time, he had knowledge of the potential problems he now asserts.[1]
In light of the strict construction of this statute by the courts as well as the Legislature’s failure to amend the statute, this court finds that it lacks the jurisdiction to entertain this application. This action was not timely commenced. The action was commenced more than 10 days after the date of the primary election.
The court, therefore, dismisses the petition and grants permission to the respondent Frisa to interpose his cross claim. Upon the respondent’s cross claim to validate the primary results, judgment is awarded to respondent and the Board is directed to certify that Daniel Frisa is the candidate *868 of the Republican Party for the Office of Member of Congress in the Fourth Congressional District.[2]
[3]

. The court is aware of the filing requirements of CPLR 304 and that on Friday, September 23rd, after 5:00 p.m. it would have been impossible to file anything in the County Clerk’s office until Monday morning, September 26th. At this point, however, the court need not decide if those requirements could have been waived by an order to show cause signed at any time that day by a Justice of this court. No attempt was made to do so.

. On October 3, 1994, the court held a preliminary hearing with respect to the petition. Since the principal allegation made by petitioner was the discrepancies between the buff cards and the canvass conducted by the Board of Elections, the court directed the Board of Elections to recanvass the election districts set forth in the affidavit of Robert Barra, attached to the petition.
On October 4, 1994, a telephone conference call was held on the record, at which time it was agreed by counsel for petitioner, Levy, and respondent, Frisa, that the Board of Elections recanvass all the election districts in the Fourth Congressional District. Initially, the court was advised that the re-tally would be completed by Thursday, October 6th, at the latest. This re-tally was not completed until October 7, 1994. The hearing was recommenced on October 7,1994 at 2:00 p.m.
Testimony was taken with respect to procedures used by the Board of Elections and its findings. The court adopts as its findings of fact the Board’s exhibit No. 1 in evidence, compiled by the Board of Elections. The discrepancy was 418 more votes cast on the machine on the Republican line than there were signers of the buff cards. The basis used for calculating the discrepancy in each election district was the higher number of votes cast on the machine for Governor or Congress, as the case may be.
The court makes these findings of fact with respect to the petition so the entire record is before the Appellate Division, in the event that there is an appeal to that Court. This court, however, makes no conclusions of law as to these findings since it is unnecessary to do so in light of its determination as to jurisdiction.

. It is somewhat speculative to assume that because the number of disputed votes exceeded the margin of difference by almost eight to one, that eliminating the 418 votes, even if that could be done, would have changed the result. If, in election districts where Mr. Levy outpolled Mr. Frisa by wide margins there were more votes cast than there were registrants signing the buff cards, the total number of 418 becomes less significant. In at least one election district, Frisa had no votes cast for him (A. D. 18 E. D. 43), yet the Board showed that there were two illegal votes cast. Furthermore, even on an over-all view, the margin of difference between the candidates was less than 1%, making it improbable that elimination of the excess votes would change the result. The total number of election districts, 465, exceeded the discrepancy so that, on average, there was less than one excess recorded vote in each district. In order to cancel out the 54-vote margin, Frisa votes would have to exceed Levy votes by at least 54, which means that in order to create a tie vote, Frisa votes of the total 418 would have to be 236, and Levy votes 182 or Frisa 56.5% and Levy 43.5%, a difference of 13%.
Moreover, respondent Frisa argues that the 418-vote figure is inaccurate. Using only the congressional race numbers, he shows only a 272-vote discrepancy. If this is so, the probabilities of a changed result are even less. The submitted affidavit of the Frisa’s expert, not considered by the court (see, Matter of Regan v O’Toole, 104 AD2d 728, affd, 63 NY2d 681), reinforces the improbability of a changed result.